# 13-3963cv

## United States Court of Appeals
## for the Second Circuit

———————————

JEFFREY LLOYD, on behalf of himself and those similarly situated, SUSAN HYMAN, LAWRENCE R. KAUFMANN, ALAN B. KRICHMAN, GRAEME PATEY, PETER PICCOLI, SCOTT VANHOOGSTRAAT, JOSHUA STOUSE, JEFFREY LAMMERT, JENNIFER ZAAT-HETELLE, ROBERT M. JOHNSON, SAMIR MAKAR,

*Plaintiffs - Appellees*,

ELLEN SZYMKIEWICZ, on behalf of herself and those similarly situated,

*Plaintiff*,

v.

J.P. MORGAN CHASE & CO. and CHASE INVESTMENT SERVICES CORP.,

*Defendants - Appellants*.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF PUBLIC JUSTICE, P.C., AS *AMICUS CURIAE*
## IN SUPPORT OF PLAINTIFFS-APPELLEES

Leah M. Nicholls
Public Justice, P.C.
1825 K Street NW, Suite 200
Washington, DC 20006
(202) 797-8600
lnicholls@publicjustice.net

April 29, 2014

## CORPORATE DISCLOSURE STATEMENT

Public Justice, P.C., is a professional corporation. Public Justice does not have any parent companies, and there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF THE INTEREST OF *AMICUS CURIAE* ...................................1

INTRODUCTION ........................................................................2

ARGUMENT ...........................................................................3

I.     The Financial Industry Has Chosen Self-Regulation Instead of
       Government Regulation....................................................................3

       A.     A Brief History of Self-Regulation in the Financial Industry..............3

       B.     FINRA Is the Latest Self-Regulatory Organization in the
              Financial Industry..................................................................6

       C.     Within FINRA, Members Must Abide by the FINRA Rules or
              Risk Disciplinary Proceedings and Expulsion. ...................................8

II.    SROs Like FINRA Confer Enormous Benefits on the Financial Industry. ..12

CONCLUSION .........................................................................16

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

*Belton v. Hatch*,
17 N.E. 225 (N.Y. 1888) ................................................................4, 8

*Credit Suisse First Boston Corp. v. Grunwald*,
400 F.3d 1119 (9th Cir. 2005) ...............................................9, 15, 16

*D.L. Cromwell Investments, Inc. v. NASD Regulation, Inc.*,
279 F.3d 155 (2d Cir. 2002) .................................................................9

*Datek Securities Corp. National Association of Securities Dealers, Inc.*,
875 F. Supp. 230 (S.D.N.Y. 1995) .......................................................9

*Fiero v. Financial Industry Regulatory Authority, Inc.*,
660 F.3d 569 (2d Cir. 2011) ..........................................................9, 13

*Gates v. NASD*,
No. LR-C94-71 (E.D. Ark. Apr. 1, 1994) ..........................................13

*Public Investors Arbitration Bar v. U.S. S.E.C.*,
930 F. Supp. 2d 55 (D.D.C. 2013) .....................................................13

*Rosenberg v. MetLife, Inc.*,
866 N.E.2d 494 (N.Y. 2007) .......................................................14, 15

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*,
483 U.S. 522 (1987) ...........................................................................13

*Shultz v. SEC*,
614 F.2d 561 (7th Cir. 1980) .............................................................10

*UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*,
660 F.3d 643 (2d Cir. 2011) ................................................................8

## STATUTES

5 U.S.C. § 522 ................................................................................13

5 U.S.C. § 551, et seq. ....................................................................13

15 U.S.C. § 78o-3(a)(2) ..................................................................11

1827 N.Y. Laws, 329 ...................................................................................3

## AGENCY PROCEEDING

*In the Matter of the Application of Frank L. Palumbo*,
    52 S.E.C. 467 (1995) ........................................................................10

## FINRA BYLAWS, RULES, AND PROCEEDING

*Department of Enforcement v. Charles Schwab & Co.*,
    Compl. No. 2011029760201 (FINRA Bd. of Governors Apr. 24,
    2014), *available at* www.finra.org/web/idcplg?IdcService=SS_
    GET_PAGE&ssDocName=P493598 ...........................................11, 12

FINRA Bylaws art. IV, § 1, *available at* http://finra.complinet.com/en/
    display/display_main.html?rbid=2403&element_id=4609 ...................8

FINRA Bylaws art. VII, § 1, *available at* http://finra.complinet.com/en/
    display/display_main.html?rbid=2403&element_id=4629 .................10

FINRA Bylaws art. XI, § 1, *available at* http://finra.complinet.com/en/
    display/display_main.html?rbid=2403&element_id=4661 ............8, 10

FINRA Bylaws art. XIII, § 1, *available at* http://finra.complinet.com/en/
    display/display_main.html?rbid=2403&element_id=4663 .................9

FINRA Rules, *available at* http://finra.complinet.com/en/display/display_
    main.html?rbid=2403&element_id=607 .............................................9

## OTHER AUTHORITIES

Birdthistle, William A. & Henderson, M. Todd, *Becoming a Fifth Branch*,
    99 Cornell L. Rev. 1 (2013)........................................................*passim*

Ellis, Nan S., Fairchild, Lisa M. & Fletcher, Harold D., *The NYSE
    Response to Specialist Misconduct: An Example of the Failure of Self-
    Regulation*, 7 Berkeley Bus. L.J. 102 (2010) ......................................6

FINRA Oversight Could Cost Investors, FA-Mag.com (June 28, 2011),
    http://www.fa-mag.com/news/finra-oversight-could-cost-investors-
    7634.html ...........................................................................................13

iv

Irwin, Steven; Lane, Scott; Mendelson, Carolyn & Tighe, Tara, *Self-Regulation of the American Retail Securities Markets—An Oxymoron for What Is Best for Investors?*, 14 U. Penn. J. Bus. L. 1055 (2012) ..................7

Lichtor, Michelle, *How "Suitable" Is the Language of Suitability in the Modern ERA?*, 39 J. Corp. L. 201 (2012)..........................................................10

Macey, Jonathan & Novogrod, Caroline, *Enforcing Self-Regulatory Organization's Penalties and the Nature of Self-Regulation*, 40 Hofstra L. Rev. 963 (2012) ............................................................................ 5, 7, 10-11

## STATEMENT OF THE INTEREST OF *AMICUS CURIAE*

Public Justice, P.C. (Public Justice) is a national public interest law firm that specializes in precedent-setting and socially significant civil litigation and is dedicated to pursuing justice for the victims of corporate and governmental abuse. Public Justice prosecutes cases designed to advance consumers' and victims' rights, civil rights and civil liberties, occupational health and employees' rights, the preservation and improvement of the civil justice system, and the protection of the poor and powerless.[1]

To further its goal of defending access to justice for consumers, employees, and other persons harmed by corporate misconduct, Public Justice has initiated special projects devoted to fighting abuses of mandatory arbitration, opposing expansive assertions of federal preemption, and preserving the integrity of collective and class actions, and our experience is that the collective and class action devices, properly used, often represent the only meaningful way that individuals can vindicate important legal rights.

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), Public Justice certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of the brief; and no person other than Public Justice contributed money intended to fund the preparation or submission of the brief. All parties have consented to the filing of this brief.

Public Justice thus submits this brief in support of Appellees urging the Court to affirm the decision below and permit Appellees' collective action to go forward.

## INTRODUCTION

Though the Financial Industry Regulatory Authority (FINRA) is of relatively recent vintage, the financial industry has long written and enforced its own rules through private means. This privatization of the securities law—which arose at the behest of the financial industry itself—has conferred enormous benefits on industry players who, by choosing governance through a self-regulatory organization (SRO), have opted out of many of the general legal rules that would otherwise apply. That is fair enough. But a self-regulatory system like FINRA is not a buffet, allowing parties to pick and choose which rules they'd like to follow and which they would not. Instead, the cost of agreeing to self-regulate is the obligation to fully comply with all the rules that the private legal system has created. Here, JPMorgan Chase should be held to the FINRA rules it agreed to in its membership agreement, rules it further committed to in its contracts with its employees.

# ARGUMENT

## I. The Financial Industry Has Chosen Self-Regulation Instead of Government Regulation.

### A. A Brief History of Self-Regulation in the Financial Industry.

The history of the SRO is, in many ways, the history of the American financial industry itself. As early as the eighteenth century, groups of stockbrokers were banding together to develop SROs as a way to circumvent and forestall government regulation. William A. Birdthistle & M. Todd Henderson, *Becoming a Fifth Branch*, 99 Cornell L. Rev. 1, 14 (2013). For example, a 1792 New York law made third-party stock sale contracts unenforceable in New York state courts. *See* 1817 N.Y. Laws, 329, 333. In response, stockbrokers created their "own parallel legal system" that, through private rules, enforced the contracts that the government would not. Birdthistle, *supra*, at 14.

The early nineteenth century brought formality to these sorts of associations with the creation of the New York Stock and Exchange Board (NYSE) in 1817, an organization that gradually grew to dominate securities trading for the next hundred years. *Id.* at 15. One reason for NYSE's dominance was its increasingly extensive self-regulatory system. That system allowed industry players a way to resolve disputes away from the courts, under separate rules, and in front of industry-focused decisionmakers. *Id.*

By the close of the 1800s, courts had begun to accept the legitimacy of the industry's use of SROs to police its traders. For instance, in *Belton v. Hatch*, the New York Court of Appeals upheld a broker's expulsion from the NYSE, finding that his membership was governed by the NYSE terms of membership, not by any outside law. 17 N.E. 225, 227 (N.Y. 1888). As the court explained, the "constitution and the by-laws derive a binding force from the fact that they are signed by all the members, and that they are conclusive upon each of them in respect of the regulations of the mode of transaction of his business, and of his right to continue to be a member." *Id.* In other words, the NYSE SRO was contractual by nature and so controlled its members rights and obligations; because the broker had agreed to the terms of membership and agreed to the NYSE's control over him, the SRO's private laws—not the government's laws—controlled.

Despite the rise of the NYSE, the 1929 stock market crash sowed doubt over the effectiveness of SROs. Believing that private enforcement had failed to sufficiently protect the public or regulate the market, the Roosevelt administration proposed that industry self-regulation be replaced with government oversight, namely, that the government would approve all exchange rules and regulations. Birdthistle, *supra*, at 16. The financial industry, not surprisingly, was strongly opposed. *Id.*

A compromise ensued, in the form of the Securities and Exchange Act of 1934. This law, extended to additional markets in 1938, codified the use of self-regulatory systems and created a governmental oversight body, the Securities and Exchange Commission (SEC). Jonathan Macey & Caroline Novogrod, *Enforcing Self-Regulatory Organization's Penalties and the Nature of Self-Regulation*, 40 Hofstra L. Rev. 963, 964 (2012). Because SRO membership was not yet mandatory, SROs like the National Association of Securities Dealers (NASD)—formed in 1938 in response to the new statutes—had to resort to recruiting members by offering discounts on trades with other members. Birdthistle, *supra*, at 17. The remaining non-member brokers went unregulated.

In the decades following the Securities and Exchange Act, unstable and uneven regulation caused a "breakdown" in the SRO system. *Id.* at 18 (quoting the director of the SEC's Division of Trading and Exchanges). Investigations revealed "manipulation of securities prices, illegal touting, bribery, illegal use of inside information, and publication of misleading prospectuses," *id.*, and reports concluded that SROs were "self-interested and self-protective," *id.* (quoting an SEC study). That prompted a push for new legislation that would have required all traders to become SRO members, banned floor trading, and increased the role of government involvement in the operation of SROs. Like the previous time, the financial industry successfully lobbied for lighter government regulation, and

5

though the resulting 1964 amendments gave the SROs more power to deny

membership to unqualified brokers, the amendments went no further. *Id.* at 18-19.

Then later, more trouble. Less than ten years after the 1964 amendments, a

series of scandals rocked the SRO system—including widespread and catastrophic

record-keeping failures—and led Congress to intervene several more times. In

1970, when the SEC was given the power to require SROs to adopt rules about the

inspection of brokers; in 1975, when the SEC was empowered to approve all SRO

rules; in 1983, when broker membership in SROs became mandatory; and finally

in the 1990s, when the SEC required NASD to centralize its enforcement actions.

*Id.* at 19-22.

Despite these moves toward increased government oversight, in 2005, the

NYSE made clear that it was still very much a part of the profit-driven financial

industry by reorganizing as a for-profit, publicly traded company. Nan S. Ellis,

Lisa M. Fairchild & Harold D. Fletcher, *The NYSE Response to Specialist*

*Misconduct: An Example of the Failure of Self-Regulation*, 7 Berkeley Bus. L.J.

102, 130 (2010).

### B. FINRA Is the Latest Self-Regulatory Organization in the Financial Industry.

Out of this turbulent history, the industry sought to right the ship in 2007.

The enforcement arm of the NYSE and the NASD merged to form the non-profit

FINRA—currently the only SRO for all securities firms and brokers doing

business with members of the public. Macey, *supra*, at 964. For the industry, creating one comprehensive SRO had several advantages: By consolidating the governing rules and their enforcement, costs would drop, the enforcement process would streamline, and brokers and firms wouldn't have to deal with competing sets of rules. One SRO would, in short, be more efficient. *Id.* at 969; Birdthistle, *supra*, at 23.

For the public, the benefits of one consolidated SRO were no less important. FINRA has nearly the same budget as the SEC itself, and not at taxpayer expense (FINRA's budget is paid for by the brokers and firms it oversees), so it can bring substantial resources to bear in policing its members' conduct and safeguarding the public. Macey, *supra*, at 964; Steven Irwin, Scott Lane, Carolyn Mendelson & Tara Tighe, *Self-Regulation of the American Retail Securities Markets—An Oxymoron for What Is Best for Investors?*, 14 U. Penn. J. Bus. L. 1055, 1073 (2012). And, under the current regime, because FINRA is currently the only approved SRO for the retail securities market, membership in FINRA is mandatory for all brokers and firms dealing with the public. Assuming FINRA's rules and enforcement are robust (discussed in more detail below), that requirement ensures that all securities firms are operating under the same standards and with the same safeguards to the public.

### C. Within FINRA, Members Must Abide by the FINRA Rules or Risk Disciplinary Proceedings and Expulsion.

On the topic of safeguards and rules: When a member joins FINRA—just like NYSE members did in the 1800s—the FINRA bylaws require that the member "agree[] to comply with FINRA's rules" or risk disciplinary action, including expulsion. *UBS Fin. Servs., Inc. v. West Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 648-49 (2d Cir. 2011); *see Belton*, 17 N.E. 225; FINRA Bylaws art. IV, § 1, *available at* http://finra.complinet.com/en/display/display_main.html?rbid=2403& element_ id=4609. According to FINRA, these rules are designed

> [t]o promote and enforce just and equitable principles of trade and business, to maintain high standards of commercial honor and integrity among members . . . to prevent fraudulent and manipulative acts and practices, to provide safeguards against unreasonable profits or unreasonable rates of commissions or other charges, to protect investors and the public interest, to collaborate with governmental and other agencies in the promotion of fair practices and the elimination of fraud, and in general to carry out the purposes of the Corporation and of the Act[.]

FINRA Bylaws art. XI, § 1, *available at* http://finra.complinet.com/en/display/ display_main.html?rbid=2403&element_id=4661.

To that end, FINRA has promulgated a series of internal conduct rules with which member firms must comply, and it is empowered to police the conduct of member firms by "conducting investigations and commencing disciplinary proceedings against [FINRA] member firms and their associated member representatives relating to compliance with the federal securities laws and

regulations." *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 157 (2d Cir. 2002) (quoting *Datek Sec. Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 875 F. Supp. 230, 232 (S.D.N.Y. 1995) (internal quotation marks omitted)). These rules are broad in scope, covering everything from "Standards of Commercial Honor and Principles of Trade" to "Supervision and Responsibilities Relating to Associated Persons" to rules governing arbitration. *See generally* FINRA Rules, *available at* http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=607.

In the event that a member firm fails to comply with a FINRA rule, FINRA has at its disposal an array of disciplinary measures. For example, under Article XIII, § 1 of FINRA's bylaws, a member firm may be subject to "censure, fine, suspension, or expulsion from membership" for any violation "of any terms, conditions, covenants, and provisions" of FINRA's rules and bylaws. FINRA Bylaws art. XIII, § 1, *available at* http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4663.

In fact, FINRA has used all of these tools in policing member firm conduct. *See, e.g.*, *Fiero v. Fin. Indus. Regulatory Auth., Inc.*, 660 F.3d 569, 572 (2d Cir. 2011) (levying fine, expelling members from FINRA, and barring members from associating with any FINRA-member firm in any capacity all for violating, among other things, FINRA conduct rules). And disciplinary measures such as expulsion

9

can be costly. *See* Michelle Lichtor, *How "Suitable" Is the Language of Suitability in the Modern ERA?*, 39 J. Corp. L. 201, 205 (2012).

These disciplinary measures, and FINRA's conduct rules governing member firms, however, are not determined through agency rulemaking. *See, e.g.*, *Shultz v. SEC*, 614 F.2d 561, 569 (7th Cir. 1980) (holding that Chicago Board Options Exchange was "not an authority of the Government" and ruling that the Administrative Procedures Act did not apply); *In the Matter of the Application of Frank L. Palumbo*, 52 S.E.C. 467, 475 (1995) ("We have repeatedly noted that the Administrative Procedure Act [5 U.S.C. §551, et seq.] does not apply to self-regulatory organizations such as the NASD."). Instead, as one would expect given FINRA's status as an SRO, the rules are created—and enforced—by the members themselves. Under FINRA Bylaws art. VII, § 1, the Board of Governors—a group largely elected by member firms themselves—is authorized to "adopt," "prescribe," and "establish" the rules and regulations governing member firms. FINRA Bylaws art. VII, § 1, *available at* http://finra.complinet.com/en/display/ display_main.html?rbid=2403&element_id=4629. And FINRA Bylaws art. XI, § 1 specifies that the Board "is hereby authorized to adopt such rules for the members and persons associated with members, and such amendments thereto as it may, from time to time, deem necessary or appropriate." FINRA Bylaws art. XI, § 1, *supra*. *See also* Macey, *supra*, at 970 ("FINRA establishes and administers rules

10

relating to qualifications for membership . . . internal operations of its members, . . . employee oversight, . . . and internal compliance regimes.").

Nevertheless, the mandatory nature of FINRA's rules is crucial; without them, FINRA would likely cease to exist as an authorized SRO. The SEC has the authority to deny an SRO's registration if the rules, or the SRO's ability to enforce them, do not sufficiently protect the public or safeguard the high ethical standards required of brokers. *See, e.g.*, 15 U.S.C. § 78o-3(a)(2) (authorizing SROs only insofar as the SEC determines that the SRO "has the capacity to be able to carry out the purposes of [Exchange Act] and to comply, and . . . to enforce compliance by its members and persons associated with its members, with the . . . rules of the association").

Just last week, in fact, FINRA pointedly made this clear. In an enforcement action against Charles Schwab & Co., the FINRA Board of Governors held that Schwab could be sanctioned for including a class action ban in its agreements with customers because such a ban violated FINRA rules—even though the same clause would be enforceable under preemptive federal law. *Dep't of Enforcement v. Charles Schwab & Co.*, Compl. No. 2011029760201 (FINRA Bd. of Governors Apr. 24, 2014), *available at* www.finra.org/web/idcplg?IdcService=SS_GET_ PAGE&ssDocName=P493598. The FINRA Board made clear that a FINRA member's agreement to comply with FINRA rules, which are approved by the

11

SEC, was mandatory and enforceable, and that a member could not rely on other law to justify departing from it. *Id.* at 21.

If Schwab's argument had held sway, the efficacy of the SRO scheme would be seriously compromised. As is evidenced by the history of self-regulation in the financial services industry, successful self-regulation depends on the mandatory nature of the scheme. When firms are not required to participate in the SRO system fully, there is no comprehensive parallel legal system, and actors in the financial systems are insufficiently regulated—the cause of the scandals in almost every decade between the Securities and Exchange Act and when SRO membership became mandatory in 1983.

## II. SROs Like FINRA Confer Enormous Benefits on the Financial Industry.

Although, as the *Schwab* enforcement action demonstrates, FINRA firms must comply with FINRA rules even when they would prefer not to, most of the time, the mandatory and private nature of SRO membership and rules confers enormous benefits on SRO members. SRO membership and rules take the place of potentially more restrictive general law and allows firms to take advantage of the quasi-governmental status of the SROs.

To begin, because FINRA is technically a private organization and not a government agency, it can avoid several key obligations with which federal agencies themselves must comply. For instance, FINRA is not subject to FOIA

12

requests. *See, e.g.*, *Pub. Investors Arbitration Bar v. U.S. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C. 2013) (affirming denial of FOIA request for SEC documents related to FINRA); *Gates v. NASD*, No. LR-C94-71 (E.D. Ark. Apr. 1, 1994) (dismissing FOIA claim against NASD and finding that FOIA did not apply to NASD). Nor is it considered a "state actor," so it cannot be compelled to share information—like investigative material in ongoing investigations of member firms—with other governmental regulators. *See, e.g.*, FINRA Oversight Could Cost Investors, FA-Mag.com (June 28, 2011), http://www.fa-mag.com/news/finra-oversight-could-cost-investors-7634.html. Other laws which FINRA avoids include: the Administrative Procedure Act, 5 U.S.C. § 551, et seq., the public records laws, 5 U.S.C.§ 522, and due process requirements, *see San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 543-44 (1987). And, it lacks the authority to obtain judicial enforcement of fines it levies against members. *Fiero*, 660 F.3d at 571.

Even though financial firms can avoid many governmental obligations because SROs are not governmental bodies, they also reap the benefits of being considered quasi-governmental bodies—SROs, after all, comprehensively regulate the financial industry and do so in place of direct government regulation. For example, in *Rosenberg v. MetLife, Inc.*, the New York Court of Appeals accepted the financial firm's argument that its termination forms were subject to an absolute

13

privilege in a defamation lawsuit. 866 N.E.2d 494 (N.Y. 2007). Under New York

law, such a privilege is reserved for investigation-stage communications made by

individuals participating in governmental or quasi-governmental proceedings. *Id.*

at 442-43.

Under then-NASD rules, firms were required to complete and file a

termination document called a Form U-5. *Id.* at 440. On a Form U-5, a broker-

employer must explain why an employee was terminated, and the form remains in

a database where it can assist prospective future employers in researching potential

employees. *Id.* at 444. The information on a Form U-5 may also signal to the SRO

that further investigation with an eye toward possible disciplinary proceedings is

warranted. *Id.*

In *Rosenberg*, MetLife completed and filed a Form U-5 indicating that

Chaskie Rosenberg was terminated because he violated company policies

regarding speculative insurance sales. *Id.* at 441. The NASD never investigated

Rosenberg, and Rosenberg sued MetLife, alleging that MetLife discriminated

against him based on his religion and that MetLife defamed him in its statements

on Form U-5. *Id.* at 441-42. MetLife contended that Form U-5 was entitled to

absolute privilege in the context of defamation because, when filed, the Form U-5

is a "preliminary step in a quasi-judicial process." *Id.* at 442.

14

The court agreed with MetLife, reasoning that the NASD was a quasi-governmental entity because it carried out the bulk of the regulation of the securities industry, regulation that would otherwise be carried out by the SEC. *Id. a*t 443-44.

Furthermore, firms have used the existence of federally required, mandatory SRO rules to avoid compliance with more onerous state law. For example, in *Credit Suisse First Boston Corp. v. Grunwald*, financial firms gained an important exemption from state law governing arbitration. 400 F.3d 1119 (9th Cir. 2005).

In the context of an employment-termination dispute, CSFB had filed suit against its former employee, Michael Scott Grunwald, in federal court, and it obtained a preliminary injunction requiring Grunwald to arbitrate through the NASD, as required by the CSFB employment procedures. Accordingly, Grunwald sought arbitration with the NASD. *Id.* at 1122.

Before the panel could be selected, California adopted disclosure and disqualification standards for neutral arbitrators. *Id.* In response, the NASD suspended all of its arbitration in California unless the parties agreed to waive the California ethical standards. *Id.* Grunwald declined to do so and asked the court to reconsider the preliminary injunction. *Id.* at 1123.

Throughout the court proceedings, CSFB and NASD argued that California law should be preempted by NASD rules because the SRO rules carry the

15

imprimatur of federal law. *Id.* at 1135-36. The Ninth Circuit agreed, holding that even though, for many of the rules, it would not be impossible for an arbitrator to comply with both the California and NASD standards, the California standards stood as an obstacle to the accomplishment of the goals of Congress—delegating regulatory and enforcement authority to the NASD. *Id.* at 1135. If states could set ethical standards for NASD arbitrators, those states would interfere with authority of the NASD. *Id.* at 1136.

As these examples demonstrate, gaining membership in FINRA frequently shields member firms from complying with outside laws and obligations. That fact poses a basic fairness concern: Member firms should not be permitted to avoid liability on the basis that they must comply with SRO rules, but then be able to put those rules to the side when it would be more advantageous for them to do so. Rather, they are either bound by all the rules (which is the condition on which they are a member of the SRO) or they are also bound by external rules and liability. Members cannot have it both ways.

## CONCLUSION

For the reasons discussed above, the district court's decision requiring that Chase comply with FINRA rules should be affirmed.

Respectfully submitted,

 /s/ Leah M. Nicholls
Public Justice, P.C.
1825 K St. NW, Suite 200
Washington, DC 20006
(202) 797-8600 (tel)
(202) 232-7203 (fax)
lnicholls@publicjustice.net

Counsel for *Amicus Curiae*
Public Justice, P.C.

April 29, 2014

# CERTIFICATE OF COMPLIANCE

This Brief of Public Justice, P.C., as *Amicus Curiae* in Support of Plaintiffs-Appellees complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 3,543 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

 /s/ Leah M. Nicholls
Public Justice, P.C.
1825 K St. NW, Suite 200
Washington, DC 20006
(202) 797-8600 (tel)
(202) 232-7203 (fax)
lnicholls@publicjustice.net

Counsel for *Amicus Curiae*
Public Justice, P.C.

April 29, 2014